UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THAD LAVALLEE, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 22-10554-JGD |
| TOWN OF DEDHAM, DEDHAM PUBLIC ) | |
| SCHOOLS, MICHAEL WELCH, in his ) | |
| individual capacity, and JAMES FORREST, ) | |
| in his individual capacity, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANTS' MOTION TO STRIKE AND
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

June 7, 2024

DEIN, U.S.M.J.

**I. INTRODUCTION**

Plaintiff Thad LaVallee ("LaVallee"), a former English and Special Education teacher at

Dedham High School, has brought suit against the Town of Dedham, Dedham Public Schools,

Michael Welch ("Welch"), and James Forrest ("Forrest") (collectively, the "Defendants"),[1]

asserting various federal and state law claims in response to the Defendants' decision not to

renew his teaching contract for the 2019-2020 school year.  While LaVallee's Complaint is in

large part composed of allegations that he was retaliated against for his decision not to stand

for the recitation of the Pledge of Allegiance at the start of each school day, interwoven in his

---

[1] LaVallee's Complaint ("Compl.") (Docket No. 1) names defendants Welch and Forrest in their individual
capacities and refers to them as the "Individual Defendants."  (See Compl. ¶ 11).

pleadings are allegations that the Defendants attempted to order or coerce him into standing, and he challenges the constitutionality of any such direction.

LaVallee's Complaint sets forth eight (8) counts which include: "Federal Free Speech Claim Against All Defendants" (Count I); "Federal Free Exercise / Establishment Clause Claim Against All Defendants" (Count II); "Federal Substantive Due Process Clause Claim Against Principal Forrest" (Count III); "State Free Speech Claim Against Individual Defendants" (Count IV); "State Free Exercise and Establishment Clause Claims Against Individual Defendants" (Count V); "State Substantive Due Process Clause Claim Against Principal Forrest" (Count VI); "Tortious Interference with Advantageous / Contractual Relationships Against Individual Defendants" (Count VII); and "Wrongful Termination Against All Defendants" (Count VIII).  (Compl. ¶¶ 80-97).

Each side has moved for summary judgment, and this matter is before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 50) and the "Plaintiff's Partial Motion for Summary Judgment" (Docket No. 54).  While, in their motion, the Defendants contend that they are entitled to judgment as a matter of law on all counts of LaVallee's Complaint, LaVallee has moved for partial summary judgment as to Counts I and II alone.  This matter is also before the court on the "Defendants' [] Motion to Strike Plaintiff's Affidavit and Statement of Undisputed Material Facts" (Docket No. 59), by which the Defendants seek to strike from the summary judgment record the entirety of an affidavit submitted by LaVallee in support of his Motion for Partial Summary Judgment or, in the alternative, certain statements within the affidavit which they maintain are contradictory, irrelevant, or otherwise inadmissible.

[2]

After consideration of the parties' written submissions and their oral arguments, the Defendants' Motion to Strike is ALLOWED IN PART and DENIED IN PART, the Defendants' Motion for Summary Judgment is ALLOWED, and the Plaintiff's Motion for Partial Summary Judgment is DENIED.  Even reading the record in the light most favorable to LaVallee, the material facts are not in dispute and LaVallee has failed to state a claim under any theory presented.  Therefore, judgment shall enter in favor of the Defendants and the Complaint shall be dismissed.

## II. DEFENDANTS' MOTION TO STRIKE[2]

The Defendants have moved to strike, in its entirety, "Plaintiff LaVallee's Affidavit in Support of His Motion for Summary Judgment" ("LaVallee Aff.") (Docket No. 57) on the grounds that the affidavit contains inadmissible statements which "contradict [LaVallee's] sworn deposition testimony or written documents the authenticity of which is undisputed," are based on "sheer speculation," or are "completely irrelevant to his claims."  (Docket No. 59 at 1).[3]  In the alternative, the Defendants ask that the court strike specific portions of the affidavit and any related sections of the "Plaintiff's Statement of Undisputed Material Facts in Support of His Partial Motion for Summary Judgment" (Docket No. 56).  (Id.).

---

[2] Because resolution of the Defendants' Motion to Strike will help "define the record on which the summary judgment rests[,]" that motion is considered before analysis of the motions for summary judgment or recitation of the relevant facts.  Foregger v. Residential Credit Solutions, Inc., Civil Action No. 12-11914-FDS, 2014 WL 1364788, at *3 (D. Mass. Apr. 4, 2014) (quoting Livick v. Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008)).

[3] For the sake of consistency, and due to the lengthy record in this case, any citations to briefs or exhibits will be to the corresponding docket number, and any citations to page numbers will refer to the court's CM/ECF numbering system located at the top right of each page of that brief or exhibit.

In particular, and as described in their supporting memorandum (Docket No. 60), the

Defendants seek to strike the following portions of the LaVallee Affidavit: (i) Paragraph 6, first

sentence; (ii) Paragraph 6, third sentence; (iii) Paragraph 7; (iv) Paragraph 10; (v) Paragraph 13,

first sentence; (vi) Paragraph 14, subparagraph 11, first sentence; (vii) Paragraph 14,

subparagraph thirteen; (viii) Paragraph 14, subparagraph sixteen; and (ix) Paragraph 14, in its

entirety.

There are sufficient non-objectionable portions of LaVallee's Affidavit so that striking it

in its entirety is not warranted.  See Perez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001)

(faced with a challenge to an affidavit, court takes "a selective approach" and disregards only

those portions that are inadequate and considers the rest) (and cases cited).[4]  Accordingly, for

reasons stated more fully below, the Defendants' Motion to Strike is hereby ALLOWED IN PART

and DENIED IN PART.

### A.  Legal Standard

Fed. R. Civ. P. 56(c)(4) provides that:

> [a]n affidavit or declaration used to support or oppose a motion must be made on
> personal knowledge, set out facts that would be admissible in evidence, and show
> that the affiant or declarant is competent to testify on the matters stated.

An affidavit submitted in connection with a motion for summary judgment remains

subject to the "sham affidavit" rule.  "[W]hen an interested witness has given clear answers to

unambiguous questions, he cannot create a conflict and resist summary judgment with an

affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the

---

[4] Perez references "Fed. R. Civ. P. 56(e)" which, prior to the 2010 amendment and restyling of the Rule, contained language substantively similar to that of current Rule 56(c)(4).  See Fed. R. Civ. P. 56, Committee Notes on Rules – 2010 Amendment.

testimony is changed." <u>Reynolds v. Steward St. Elizabeth's Med. Ctr. of Boston, Inc.</u>, 364 F.

Supp. 3d 37, 52 (D. Mass. 2019) (additional quotations and citation omitted).  The First Circuit

has made clear, however, "that '[a] subsequent affidavit that merely explains, or amplifies

upon, opaque testimony given in a previous deposition is entitled to consideration in

opposition to a motion for summary judgment.'" <u>Id.</u> (quoting <u>Gillen v. Fallon Ambulance Serv.,

Inc.</u>, 283 F.3d 11, 26 (1st Cir. 2002)).  Consequently, in assessing a motion to strike, a court must

first determine whether the "post-deposition affidavit contradicts [the] deposition testimony or

whether the affidavit clarifies or augments the deposition." <u>Mahan v. Boston Water & Sewer

Comm'n</u>, 179 F.R.D. 49, 55 (D. Mass. 1998).  If there is a clear contradiction between the

deposition testimony and the post-deposition affidavit, "a satisfactory explanation is required."

<u>Id.</u>

Separately, and of particular relevance here, affidavits submitted in connection with a

motion for summary judgment "also may not contain arguments or conclusory assertions that

would not be admissible at trial." <u>Reynolds</u>, 364 F. Supp. 3d at 57 (additional citations and

quotations omitted).  In weighing the admissibility of such statements, "personal knowledge is

the touchstone." <u>Perez</u>, 247 F.3d at 315 (citation omitted).  Such personal knowledge "must

concern facts as opposed to conclusions, assumptions, or surmise[,]" <u>id.</u> at 316, as "[w]ithout

any specific factual knowledge to support [a] statement, it is a mere conclusion that cannot

serve as probative evidence." <u>Reynolds</u>, 364 F. Supp. 3d at 57 (additional citations and

quotations omitted) (second alteration in original).

Applying these principles, the court will "disregard only those portions of an affidavit

that are inadequate and consider the rest." <u>OneBeacon Am. Ins. Co. v. Com. Union Assur. Co.</u>

[5]

of Canada, 804 F. Supp. 2d 77, 84 (D. Mass. 2011) (additional quotations and citations omitted).

**B.  Discussion**

### Paragraph 6, first sentence

The first sentence of paragraph six of the LaVallee Affidavit states: "On September 10, 2018, the parent of a student of mine came to school complaining that I don't stand for the Pledge of Allegiance" and then goes on to describe the meeting.  (LaVallee Aff. ¶ 6).  While the Defendants challenge this date, all parties now agree that the meeting took place on September 14, 2018, and the court will accept this later date as controlling.  (See Docket No. 60 at 3-4; "Plaintiff's Opposition to Defendants' Motion to Strike" (Docket No. 69 at 3)).

### Paragraph 6, third sentence

Describing this same meeting, the third sentence of the same paragraph reads: "Principal Forrest did nothing to stop the belligerence."  (LaVallee Aff. ¶ 6).  The Defendants move to strike this sentence on the grounds that it is contradictory, citing deposition testimony and an email marked as an exhibit to that deposition, in which LaVallee describes Forrest as having "stood up[,]" "supported" and "defended[ed] [him] while trying to maintain a sense of impartiality."  (Docket No. 60 at 4; see Docket No. 60-2 at 9, 22).  LaVallee takes the position that, irrespective of Forrest's actions "*at the beginning* of the meeting[,]" Forrest "changed course and allowed the meeting to continue unabated even after the parent threatened [his] well-being[.]"  (Docket No. 69 at 4) (emphasis in original).  The court finds this explanation plausible, and that all of the statements can be reconciled.  Since the affidavit does not directly contradict LaVallee's other testimony, the motion to strike this sentence is denied.

<u>Paragraph 7</u>

Paragraph seven states, in whole: "On September 10, 2018, Forrest told me that the expectation is that I stand for the Pledge of Allegiance, that I do not have to recite it, but that I have to actively participate by standing up." (LaVallee Aff. ¶ 7).  The Defendants characterize the portion of the statement relating to Forrest's expectation that LaVallee "actively participate" as being a "conclusory argument" and "a legal conclusion" (Docket No. 60 at 4-5), while LaVallee frames the statement as being consistent with his prior deposition testimony "of what Forrest told [him]."  (Docket No. 69 at 4).  The court concludes that only the word "actively" should be stricken.

"Affidavits purporting to describe meetings or conversations need not spell out every detail, but to receive weight at the summary judgment stage they must meet certain rudiments" in that they cannot be "predicated upon undefined discussions with unnamed persons at unspecified times[.]" <u>Perez</u>, 247 F.3d at 316.  Rather, an affidavit "must be sufficiently specific to support the affiant's position." <u>Id.</u> (quoting 11 James Wm. Moore et al., <u>Moore's Federal Practice</u>, ¶ 56.14[1][d] (3d ed. 1997)).  LaVallee's statement fits within these parameters in that it provides the requisite detail and, furthermore, is substantially consistent with his prior deposition testimony, the salient portions of which he has attached to an affidavit in support of his opposition.  (<u>See</u> Docket No. 70-1 at 85) ("[A]t the meeting . . . Mr. Forrest said, . . . 'you have to participate in the daily recitation by standing and being a part of this.'").  However, LaVallee's inclusion of "actively" in paragraph seven is inconsistent with his prior testimony and amounts to his own "characterization of the evidence" so that word will be stricken.  <u>See</u> <u>Mackey v. Town of Tewksbury</u>, Civil Action No. 15-12173-MBB, 2020 WL 68243, at

*3 (D. Mass. Jan. 7, 2020).

<u>Paragraph 10</u>

Paragraph ten of the LaVallee Affidavit reads, in its entirety: "Forrest observed me from the hallway that I continued to not stand for the Pledge of Allegiance."  (LaVallee Aff. ¶ 10). The Defendants argue that such a statement contradicts LaVallee's own sworn testimony and is "purposefully misleading" in light of LaVallee's prior testimony that, on one occasion, he had observed Forrest "walk by" his classroom while he took attendance during the recitation of the Pledge.  (Docket No. 60 at 5).  Citing the same lines of deposition transcript as the Defendants, LaVallee maintains that such a statement was the product of his "own observation" and "not clearly inconsistent with [his] deposition testimony that Forrest observed him on one occasion." (Docket No. 69 at 4).  While perhaps vague, the court finds that the statement in paragraph ten is not so inconsistent with LaVallee's prior deposition testimony to warrant its striking.  (<u>See</u> Docket No. 70-1 at 77-78) ("I did see him one time . . . It was an occasion where the pledge was actually in the process of being recited, and he walked by my classroom one morning and I was taking attendance.").  The paragraph is merely a restatement of LaVallee's prior deposition testimony and cannot be read as containing any "disabling inconsistencies[.]"  <u>Reynolds</u>, 364 F. Supp. 3d at 54.  Accordingly, it will not be stricken.

<u>Paragraph 13, first sentence</u>

The first sentence of paragraph thirteen states: "Forrest's unchecked direction that I stand for the Pledge caused me incalculable internal stress and turmoil."  (LaVallee Aff. ¶ 13). The Defendants move to strike this statement on the basis that it "not only contradicts [LaVallee's] deposition testimony but is also utterly irrelevant to his claims."  (Docket No. 60 at

5).  Citing to a different portion of the same deposition transcript, LaVallee, however, maintains that such a statement is not inconsistent with the "internal dilemma" he testified to facing in having to "choos[e] between his beliefs and supporting his family."  (Docket No. 69 at 5; see Docket No. 70-1 at 52-53).  While LaVallee did also testify to other, undefined sources of work-related stress (see Docket No. 60-2 at 18), this particular statement can be read as supplementing or "amplif[ying]" LaVallee's "opaque" prior testimony related to the internal conflict he experienced in wrestling with his decision.  Reynolds, 364 F. Supp. 3d at 52 (quoting Gillen, 283 F.3d at 26).  Therefore, it will not be stricken.

### Paragraph 14

In their motion to strike, the Defendants identify three specific sections of paragraph fourteen as either contradictory of LaVallee's prior deposition testimony or speculative.  (See Docket No. 60 at 5-7).  Having reviewed the relevant deposition testimony and other evidence, the court agrees.[5]  (See Docket No. 60-2 at 6, 13-14).  In addition to these specific sections, the Defendants characterize the remainder of paragraph fourteen, which in single-spaced form still spans four pages of LaVallee's otherwise six-page affidavit, as "nothing more than [LaVallee's] stream of consciousness laying out his opinion about how he was persecuted for his political beliefs" and as having "no connection whatsoever to the facts or issues in this case."  (Docket No. 60 at 7-8).[6]  Therefore, they move to strike the paragraph in its entirety.  LaVallee argues

---

[5] At oral argument, LaVallee's counsel acknowledged that the third challenged section, subparagraph seventeen of paragraph fourteen—referred to in error as "subparagraph sixteen" by the Defendants (Docket No. 60 at 7)—was indeed not relevant to his motion and waived any objection to its striking.

[6] Because of the paragraph's length, it is not reproduced here but can be found in Docket No. 57 at 3-6.

that the paragraph "sets forth [his] personal and nonreligious beliefs" and amounts to "a relevant and consistent augmentation of the record." (Docket No. 69 at 6). The court is not so persuaded and strikes the paragraph in its entirety.

Paragraph fourteen consists of statements untethered to LaVallee's claims which make up a narrative discourse of his own personal, political, and pedagogical beliefs. See Mackey, 2020 WL 68243, at *1 (striking entire paragraph where affidavit's statements "amount[ed] to plaintiff's subjective beliefs, personal opinions, and characterizations of the evidence" which did not "create a triable fact"). To the extent that LaVallee's beliefs are relevant to the issues in dispute, they have been put forth in admissible statements of fact, as described below. Paragraph 14, however, will be stricken.

Having decided the Defendants' Motion to Strike and resolved the scope of the record before it, the court now turns to the cross-motions for summary judgment.[7]

### III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

#### A. Statement of Relevant Facts

Unless otherwise indicated, the following facts are undisputed.[8]

---

[7] These rulings on the Defendants' Motion to Strike LaVallee's Affidavit in support of his own motion for summary judgment apply equally to the identical paragraphs 1-14 of LaVallee's second affidavit (Docket No. 68), filed in opposition to the Defendants' Motion for Summary Judgment.

[8] The facts described herein are derived from the following materials and have been limited, where appropriate, in light of the court's ruling on the Defendants' Motion to Strike: (1) the "Defendants' Statement of Material Facts" ("DSOF ¶ __") (Docket No. 52); (2) the "Affidavit of Brian E. Lewis in Support of Defendants' Motion for Summary Judgment" (Docket No. 53), and select exhibits attached thereto ("Lewis Aff., Ex. __"); (3) the "Plaintiff's Statement of Undisputed Material Facts in Support of His Partial Motion for Summary Judgment" ("PSOF ¶ __") (Docket No. 56); (4) "Plaintiff LaVallee's Affidavit in Support of His Motion for Summary Judgment" ("LaVallee Aff. ¶ __") (Docket No. 57); (5) the "Affidavit of Lucas Newbill" (Docket No. 58) in support of LaVallee's Motion for Partial Summary Judgment, and select exhibits attached thereto ("Newbill Aff. 1, Ex. __"); (6) the "Affidavit of Lucas Newbill" (Docket No. 63) in support of LaVallee's Opposition to Defendants' Motion for Summary

<u>LaVallee Begins Teaching at Dedham High School</u>

Beginning in September 2017 and continuing up until June 2019, LaVallee, a resident of Sharon, Massachusetts, worked as a dual English and Special Education teacher at Dedham High School, a school within the Dedham Public School system of Dedham, Massachusetts.  (DSOF ¶ 1; PSOF ¶¶ 2-3).  During this period, defendant Forrest served as principal of Dedham High School and defendant Welch as the Superintendent of Dedham Public Schools.  (PSOF ¶¶ 4, 6).  In his role as Superintendent, Welch hired and evaluated all staff and supervised Forrest.  (<u>Id.</u> ¶¶ 9-10).  As such, Welch acted as the final decisionmaker with respect to teacher employment and authored all nonrenewal letters issued by Dedham Public Schools.  (<u>Id.</u> ¶¶ 11-12; <u>see</u> Lewis Aff., Ex. C at 8).

Throughout his employment at the high school, LaVallee held non-professional teacher status in that he received annual appointments from Dedham Public Schools to teach English and Special Education.  (DSOF ¶ 3).  Because of LaVallee's non-professional status, the Defendants had sole discretion to decide whether to renew—or not renew—his teaching contract.  (<u>Id.</u> ¶ 4; <u>see</u> Lewis Aff., Ex. B at 4, 8).

<u>LaVallee's First-Year Evaluations</u>

Throughout the 2017-2018 school year, LaVallee's supervisors engaged in two announced and four unannounced observations of his classroom in order to observe and evaluate his teaching.  (DSOF ¶ 5).  Such evaluations were routine for Dedham Public School

---

Judgment, and select exhibits attached thereto ("Newbill Aff. 2, Ex. __"); (7) the "Plaintiff's Response to Defendants' Statement of Material Facts and Counter-Statement of Material Facts" ("PCSOF ¶ __") (Docket No. 65); and (8) the "Defendants' Response to Plaintiff's Statement of Undisputed Material Facts in Support of His Partial Motion for Summary Judgment" ("DCSOF ¶ __") (Docket No. 66).

professional staff and were intended to identify areas of improvement and further develop staff performance.  (See Lewis Aff., Ex. C at 9).  While the parties each characterize the evaluations differently, a review of the October 2, 2017 Unannounced Observation form of the then-Dedham High School Vice Principal Ronald Sudmyer ("Sudmyer") and the February 26, 2018 Announced Observation form of then-Special Education Department Chair Mary Bruhl ("Bruhl") establishes that, in addition to positive comments, LaVallee also received feedback critical of his level of engagement with his students.  (DSOF ¶¶ 5-7; PCSOF ¶¶ 5-7; see Lewis Aff., Ex. D at 32, 34-35).  These comments were carried into his year-end Summative Evaluation Form prepared by Bruhl which rated him as "Proficient" in certain areas but as "Needs Improvement" in Standard 1 of the form, which rated the following:

> The teacher promotes the learning and growth of all students by providing high-quality and coherent instruction, designing and administering authentic and meaningful student assessments, analyzing student performance and growth data, using this data to improve instruction, providing students with constructive feedback on an ongoing basis and continuously refining learning objectives.

(DSOF ¶ 9; Lewis Aff., Ex. D at 37-38).  In supporting her rating in Standard 1, Bruhl noted, in relevant part:

> Dr. Lavallee can sometimes provide too much guidance to students thus providing them with more answers or work than necessary. This impedes their independence in these activities and leads to potential difficulty in creating the same caliber of work in the future.  It was discussed that Dr. Lavallee should have a goal of supporting students but increasing their independence with tasks at the same time[.]

(DSOF ¶ 10; Lewis Aff., Ex. D at 38).  In comments related to her "Overall summative rating[,]" Bruhl wrote, in relevant part:

> It is encouraged that Dr. Lavallee continue to evaluate the level of support he is providing students with [in] their writing and assure that they are independently improving their practice and not relying on his support to truly express their

thoughts. . . . Dr. Lavallee continues to work on the balance of how to support student work without putting too much of himself within the work itself.  It is encouraged that he continue to work on th[ese] skills and therefore increase overall student independence as a result.

(DSOF ¶ 10; Lewis Aff., Ex. D at 39).  LaVallee's contract was later renewed for the 2018-2019 school year.  (DSOF ¶ 11).

<u>The Parent Complaint and LaVallee's Refusal to Stand for the Pledge of Allegiance</u>

Like many other public schools across the country, Dedham High School began most school days with a recitation of the Pledge of Allegiance (the "Pledge").[9]  (Newbill Aff. 1, Ex. 7 at 5).  On September 9, 2018, following the start of the 2018-2019 school year, Forrest called LaVallee to inform him that a parent of one of his students had complained to the school about the content of LaVallee's English class, the absence of an American flag in his classroom, and LaVallee's decision not to stand for the Pledge,.  (DSOF ¶ 12).  In their conversation, LaVallee informed Forrest that he had taken down the flag where it hung in his classroom because its placement restricted movement within the classroom, and he further informed Forrest that he did not stand for the Pledge due to his own personal and political beliefs.  (<u>Id.</u> ¶¶ 14-15; PCSOF ¶ 15; <u>see</u> Newbill Aff. 1, Ex. 1 at 42-43, 50).

The next day, on September 10, 2018, Forrest met with LaVallee in order to discuss the parent complaint.  (DSOF ¶ 16; PCSOF ¶ 16).  The Defendants maintain that at this meeting

---

[9] Mass. Gen. Laws ch. 71, § 69 provides, in relevant part, that classrooms must display an American flag and recite the Pledge of Allegiance once during each school day.  (DSOF ¶ 13; PCSOF ¶ 13).  On June 3, 1977, the then-Attorney General of Massachusetts issued an opinion stating "that unless school authorities make a factual showing that a teacher's conduct (1) poses a danger of material and substantial disruption of schoolwork or discipline, or (2) constitutes an attempt to improperly propagandize the teacher's views, a teacher's refusal to participate in or lead the pledge of allegiance is constitutionally protected" and that Mass. Gen. Laws ch. 71, § 69 "is inconsistent with the First Amendment of the Constitution of the United States and may not be enforced."  (Lewis Aff., Ex. J at 10).

"Forrest asked LaVallee to stand for the Pledge[,]" while LaVallee states that he was "directed" to stand, and to "participate" in its observance by doing so.  (DSOF ¶ 16; PCSOF ¶ 16; <u>see</u> LaVallee Aff. ¶ 7).  The parties do agree, however, that while Forrest told LaVallee that it was his expectation that LaVallee stand for the Pledge, he also stated that LaVallee did not have to recite its words.[10]  (PSOF ¶ 21; DCSOF ¶ 21; <u>see</u> Lewis Aff., Ex. D at 12-13).  LaVallee nevertheless informed Forrest that he would not stand for the Pledge because doing so would compromise his personal beliefs.  (PSOF ¶ 22).

Around this time, Forrest and others communicated with Town counsel, who offered the following advice on September 11, 2018:

> [M]y opinion is that you cannot compel the teacher to recite the pledge or salute the flag.  My understanding is that the teacher has been directed to stand, which seems to fall short of "saluting."  I would not recommend that you direct the teacher to do anything further, and we should talk if there is any push back to the order that he stand.

(Lewis Aff., Ex. J at 7; PSOF ¶ 31).

Forrest arranged a meeting between himself, LaVallee, LaVallee's English Department supervisor Brenda Hagan ("Hagan"), and the complaining parents on September 14, 2018 in order to discuss the parents' concerns.  (DSOF ¶ 18; <u>see</u> Newbill Aff. 1, Ex. 2 at 45-46).  At the meeting, one of the parents acted inappropriately and aggressively, labeling LaVallee a "terrorist-sympathizer" and producing photographs of one of his children taken from social media.  (PSOF ¶ 19).  This same parent also expressed his concerns over the content of LaVallee's English class, which he believed "pushed a certain political agenda."  (DSOF ¶ 18; <u>see</u>

---

[10] The parties are also in agreement that neither Dedham Public Schools nor Dedham High School have any formal written policy relating to employees standing for the Pledge but that, to the Town's knowledge, all teachers other than LaVallee stood for the Pledge.  (PSOF ¶¶ 43, 46).

Newbill Aff. 1, Ex. 1 at 57-58).  The parties agree that, during the meeting, Forrest expressed his appreciation for LaVallee and demonstrated his support for LaVallee's ability as an educator, but they dispute whether, as discussed in connection with the motion to strike, Forrest continued to demonstrate this same support as the meeting progressed or after it ended.  (See DSOF ¶ 18; PCSOF ¶ 18).  The student was removed from LaVallee's classroom shortly thereafter.  (DSOF ¶ 19; PCSOF ¶ 19).

On September 25, 2018, in the wake of this contentious parent meeting, LaVallee, Forrest, Hagan, LaVallee's Special Education Department supervisor Louise D'Amato ("D'Amato"), and LaVallee's union representative and fellow teacher Tim Dwyer ("Dwyer"), met to set a plan for the academic year and to follow up on issues related to the parents' complaint.  (DSOF ¶ 20).  At this meeting, Dwyer informed Forrest that LaVallee did not stand for the Pledge due to his own personal beliefs and also because he was a Jehovah's Witness.  (Id. ¶ 21; PCSOF ¶ 20).  In response, Forrest restated that LaVallee was expected to stand for the Pledge, even if he chose not to recite its words.  (DSOF ¶ 20; PCSOF ¶ 20; Newbill Aff. 1, Ex. 1 at 85).  While it is undisputed that LaVallee is an atheist and not a Jehovah's Witness, LaVallee states that he did not correct Dwyer because he believed it would bring discussion of the issue to a close.  (DSOF ¶ 21; PCSOF ¶ 21; see Lewis Aff., Ex. D at 26).  LaVallee never acted to clarify Dwyer's representation, and no further discussion of any religious or non-religious objections to the Pledge was ever held.  (See Newbill Aff. 1, Ex. 1 at 91).

The details of this meeting were memorialized in a subsequent memorandum prepared by Forrest dated October 1, 2018.  (See Lewis Aff., Ex. D at 45).  As described in that memorandum, it is undisputed that LaVallee was instructed to "keep his political agenda out of

the classroom[,]" to limit classroom discussions to those related to the "grade 10 English curriculum[,]" to seek approval from Hagan "for any materials outside of the curriculum[,]" and to meet "one time per cycle" with Hagan in order to "develop and review lesson plans for the coming week." (Id.). Any expectation that LaVallee stand for the Pledge was never referenced in Forrest's memorandum or listed as one of the listed, "agreed to . . . takeaways." (Id.).

Regardless of Forrest's position, it is undisputed that LaVallee continued to maintain his practice of sitting during the Pledge and that he did not alter this behavior. (DSOF ¶ 22; PSOF ¶ 22; see Lewis Aff., Ex. D at 22). The parties agree that LaVallee's decision not to stand did not disrupt schoolwork, and they present no evidence or argument that this issue was ever brought up again. (PSOF ¶ 36; DCSOF ¶ 36). Other than LaVallee's contention, discussed above, that on one occasion Forrest walked by the classroom during the Pledge and saw that LaVallee was not standing, LaVallee agrees that the Defendants never took any steps to observe him during the Pledge, and never sought to enforce any request that he stand. (DSOF ¶ 22; PCSOF ¶ 22). LaVallee acknowledges that at no point did Forrest state that his employment depended on him standing for the Pledge. (See Lewis Aff., Ex. D at 13).

<u>LaVallee's Second-Year Evaluations</u>

As in the prior school year, LaVallee had four unannounced observations and two announced observations of his classroom during the 2018-2019 school year. (DSOF ¶ 23). Following one such unannounced observation on October 23, 2018, Hagan noted in her evaluation:

> it is important to keep students accountable for their learning and to provide structures to help students stay on task. When you asked students to form their own groups at 1:27, some students did not move at all, and you had to form groups for them. Others formed groups and began to socialize. When I circulated,

[16]

two out of five groups were on task.

(Id. ¶ 24; see Lewis Aff., Ex. A at 2).  Hagan further observed: "students at the table in the front

of the room had their books and notes out and were waiting for the next steps.  Many students

in the class were having side conversations and checking their phones."  (Lewis Aff., Ex. A at 2).

In concluding her observation report, Hagan remarked: "I look forward to seeing some of the

strategies we discussed in action and supporting you in the process [of] keep[ing] students

engaged and accountable for their learning."  (Id.).

Following an announced observation less than a month later, on November 19, 2018,

Hagan again observed a lack of teacher-student engagement and accountability, and she wrote

in her evaluation:

> There was a lot of teacher-centered time spent on this lesson . . . Students were
> very passive in this lesson for more of the period.  How could you hold them more
> accountable for the learning? . . . The next time I visit I would like to see students
> engaged in a critical thinking activity or working collaboratively to apply what they
> have learned.   I would like to see students held accountable for learning by
> reducing the amount of teacher-directed time and increasing the amount of time
> students have to practice skills.

(DSOF ¶ 25; see Lewis Aff., Ex. D at 52).  In the closing paragraphs of her assessment, Hagan

expressed concerned over LaVallee's lesson-planning and instruction and asked LaVallee to take

time out of his own teaching so that he could shadow and learn from the teaching of his

colleagues:

> As we discussed, I would like you to contact a ninth-grade teacher to get a clear
> understanding of the 9th-grade writing curriculum and the direct instruction
> students have received in this area.  This will help you tailor writing lessons more
> directly . . . and to be on the same page with expectations. We also discussed
> asking tenth-grade teachers . . . As I mentioned, I am happy to cover your class so
> you can observe classes.  Let me know when would be a good time for you to do
> so.

[17]

(Lewis Aff., Ex. D at 52).

On December 18, 2018, Hagan, after having reviewed his lesson plans for the week, emailed LaVallee and requested he be more specific in his plans and further adjust his curriculum so as to better prepare students for their next year of high school learning.  (DSOF ¶ 26; see Lewis Aff., Ex. D at 58).  In her email, Hagan asked LaVallee whether he had reached out to other tenth-grade teachers as she had asked that he do in her November 19 observation report.  (See Lewis Aff., Ex. D at 58).  The next day, on December 19, 2018, Special Education Department Chair D'Amato completed an unannounced observation of LaVallee's class, after which she remarked:

> A few students were able to answer the questions and engaged in the conversation.  However, for the most part Dr. LaValle[e] was leading most of the discussion. . . . it was difficult to engage the students in[] [t]he conversation. . . . [LaVallee's] classroom setup is not optimal to support student[s] being able to attend to task. . . . During the lesson students that were in the seats in the back of the room were on their phones texting.

(Id. at 60; DSOF ¶ 27) (alterations added).  On February 26, 2019, Hagan completed another announced observation of LaVallee's class and again noted in her subsequent report an apparent lack of student-teacher engagement:

> While there was an attempt to hold students accountable for learning with the assignment, the implementation of this assessment needs improvement in the area of clear expectations and communicating the criteria for success. . . . Students worked diligently in pairs for about 30 minutes.  At 12:34, most student groups seemed to lose interest in working.  Many started to socialize.  At 12:47 very few students were working on the task.  They were on their phones, texting, socializing, or watching YouTube on Chromebooks.

(Lewis Aff., Ex. D at 65-66; DSOF ¶ 28).

On April 8, 2019, Dedham High School Vice Principal Kristy Yankee ("Yankee") conducted an unannounced observation of LaVallee's classroom and noted similar concerns related to

student engagement.  (DSOF ¶ 29).  In her subsequent report, Yankee rated LaVallee as "Needs Improvement" in the category of "Well Structured Lessons."  (Id.).  Following her observation, Yankee met with LaVallee that same afternoon in order to share positive feedback but, at the same time, communicate her concerns.  (Id. ¶ 30).  The report she prepared following her unannounced observation noted, in relevant part:

> In my judgment, Dr. LaVallee did not set baseline expectations for this exercise and it was not strategically connected to the class. . . . From the snapshot I saw today, I would assert that Dr. LaVallee is at a Needs Improvement level for I-A-4 (Well Structured Lessons).

(Lewis Aff., Ex. D at 71).  Yankee concluded her report by checking a box at the end of the form which indicated:

> [X]  I will be returning for an observation because of my serious and specific concerns about the following which may result in a formative or summative rating below proficient.

(Id.).  Lastly, on April 26, 2019, both Hagan and Yankee conducted an unannounced observation of LaVallee's classroom.  (DSOF ¶ 31).  In their subsequent observation report, the pair noted an apparent lack of improvement in LaVallee's teaching ability and wrote:

> Dr. LaVallee failed to plan and/or execute an introduction to the lesson.  As a result, . . . [t]here was an environment of confusion and class time was not utilized efficiently. . . .
>
> Standard 1 A. 3 and 4: Unsatisfactory.
>
> . . . On several occasions, Dr. LaVallee has been given direct feedback about setting specific and high expectations, providing rubrics for assessments, and holding students accountable for learning. . . . Despite much coaching, Dr. LaVallee missed the opportunity to communicate and enforce specific standards for student work. It was evident that the criteria for success for this student presentation were unclear. . . .

Indicator II-D-1 and 2: Unsatisfactory[.]

(Lewis Aff., Ex. D at 75).  LaVallee denies "any truth to this observation" and instead maintains

that the report functioned as a "smokescreen" to cover his nonrenewal.  (PCSOF ¶ 31).

In LaVallee's 2018-2019 school year summative evaluation, he was rated

"Unsatisfactory" in Standard 1 and "Needs Improvement" in both Standard 2 (reviewing

instructional practices) and Standard 4 (reviewing professional growth and ability to work

collaboratively with other staff).  (DSOF ¶ 32; see Lewis Aff., Ex. D at 80-82).  This evaluation

provided LaVallee with an overall summative rating of "Needs Improvement" and, among other

critiques, referenced his failure to address and improve upon the prior negative feedback he

had received:

> As evidenced in several class observations including 10/23, 11/19, and 2/26, Dr. LaVallee does not consistently design lessons or units with measurable outcomes. The activity did not hold students accountable for their learning.  Dr. LaVallee did not check homework, and many students admitted to reading only half of the reading and completing some of the notes. . . .
>
> Dr. LaVallee uses instructional practices that are likely to engage some students but leave other students uninvolved. . . . Dr. LaVallee's expectations for written and project work lack specificity.  I have not seen evidence of rubrics or exemplars despite the fact that we have had several conversations and I have documented this expectation. . . .
>
> Dr. LaVallee was absent without notification for professional development meetings on 10/10/18 and 5/15/19.  Dr. LaVallee also missed check-in meetings with Mrs. Hagan to discuss lesson plans and curriculum that were agreed upon. The dates that Dr. LaVallee missed these meeting[s] without notification are 12/5/18, 1/30/19, and 3/7/19. . . .
>
> Dr. LaVallee demonstrates limited reflection on practice and little use of insights gained to improve practice. . . . [A]s evidenced by the unannounced observation reports on 10/23, 11/19, 2/26, and 4/26, Dr. LaVallee has not applied the feedback about providing clear expectations and student accountability for learning. . . .
>
> Dr. LaVallee rarely collaborates with English department colleagues.  Mrs. Hagan

[20]

> has offered to cover Dr. LaVallee's classes so that he could observe 9th and 10th-
> grade classes, but he did not respond.  Mrs. Hagan has shared numerous lesson
> plans, units, assessments, rubrics, and MCAS preparation documents with Dr.
> LaVallee in attempts to support his growth.

(Lewis Aff., Ex. D at 81-82; see DSOF ¶ 33).  LaVallee, while admitting to the content of the

evaluation, denies its truth.  (PCSOF ¶¶ 32-33).

### The Defendants Decline to Renew LaVallee's Contract for the 2019-2020 School Year

In the spring of 2019, Forrest, with the recommendations of Hagan and Yankee and the

approval of Superintendent Welch, decided against renewing LaVallee's teaching contract for

the 2019-2020 school year.[11]  (DSOF ¶ 36; PSOF ¶ 15; PCSOF ¶ 36; see Newbill Aff. 1, Ex. 2 at

90-91).  Hagan's recommendation, in particular, was informed by the fact that after having

completed three years as a fulltime teacher at Dedham High School, LaVallee would have

attained professional teacher status—a concept commonly referred to as "tenure"—despite

the serious concerns about his ability and performance as an English teacher.  (DSOF ¶ 35; see

Newbill Aff. 2, Ex. 13 at 53).

Forrest informed LaVallee of the decision in May of 2019 (DSOF ¶ 38; Lewis Aff., Ex. D at

28), and LaVallee received formal notice of his nonrenewal by way of a letter dated June 7,

2019, which he received shortly thereafter.  (See Lewis Aff., Ex. D at 78).  Both sides

acknowledge that LaVallee's decision not to stand for the Pledge was not mentioned in

conversations surrounding the non-renewal of his contract.  (DSOF ¶ 37; PCSOF ¶ 37).

Nevertheless, they dispute the motivations behind the Defendants' decision not to renew

---

[11] The parties do not dispute that, for the purposes of LaVallee's First Amendment retaliation claim, the
non-renewal of his teaching contract "constitutes an adverse employment action."  Decotiis v.
Whittemore, 635 F.3d 22, 29 n.5 (1st Cir. 2011) (additional citation omitted).

LaVallee's contract; the Defendants attribute their decision to "concerns related to [LaVallee's] performance" (DSOF ¶¶ 36, 41), while LaVallee contends that their decision was unrelated to his performance and instead was "because of his refusal to stand for the Pledge." (PCSOF ¶¶ 36, 41). As detailed below, however, LaVallee has failed to put forth any facts to support his personal belief as to the Defendants' motivation.

Additional details relevant to this court's analysis are set forth below where appropriate.

**B.   Summary Judgment Standard of Review**

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Const. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted). The burden is upon the moving party to show, based upon the "materials in the record, including depositions, documents, . . . affidavits or declarations," "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)) (additional citation omitted). "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, citations, and alteration omitted).

The court must take the facts and "all reasonable inferences therefrom in the light most favorable to the non-moving part[y]." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010). Where, as here, cross-motions for summary judgment have been brought, this

perspective "does not vary" as the court "must view each motion separately, perusing the record through the standard summary judgment prism."  Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 9-10 (1st Cir. 2011) (additional citations omitted).  Summary judgment is therefore only appropriate "if the record, read in the prescribed manner, 'reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Id. at 10 (quoting Estate of Hevia, 602 F.3d at 40).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Reynolds, 364 F. Supp. 3d at 52 (quoting Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)).  "Essentially, Rule 56[] mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Sawyer v. Kindred Healthcare, Inc., 186 F. Supp. 3d 118, 124 (D. Mass. 2016) (additional quotations and citations omitted) (alteration in original).

**C.  Count I:  Federal Free Speech Claim Against All Defendants**

Each side has moved for summary judgment under their own construction of Count I's First Amendment "Federal Free Speech Claim" which reads, in relevant part, "[t]he Defendants' actions complained of herein violate LaVallee's Free Speech rights under the First and Fourteenth Amendments of the U.S. Constitution.  This claim is brought pursuant to 42 U.S.C. § 1983."  (Compl. ¶ 81).[12]  In their motion for summary judgment, the Defendants construe

---

[12] The Defendants do not dispute that they acted "under color of state law" at all relevant times, the first prong of any § 1983 claim.  (Docket No. 51 at 5).  Rather, for the purposes of LaVallee's § 1983 claims in Counts I through III, the dispute turns on the whether the conduct at issue amounted to "a

Count I as bringing a claim of First Amendment retaliation based upon the nonrenewal of

LaVallee's teaching contract, while, in his own motion for partial summary judgment, LaVallee

seemingly embraces a broader theory of liability, also alleging that Forrest's purported order

that he stand for the Pledge was in and of itself unconstitutional.  While each theory of First

Amendment liability requires a slightly different approach, under any construction, LaVallee has

failed to state a claim and judgment shall enter in favor of the Defendants on Count I.

<u>Defendants' Motion for Summary Judgment as to Count I</u>

In their memorandum in support of their motion for summary judgment (Docket No.

51), the Defendants focus their arguments on two primary contentions: that LaVallee's speech

"was <u>not</u> a substantial or motivating factor in the decision not to renew his contract" and that,

irrespective of the challenged conduct and in accordance with the <u>Mt. Healthy</u> defense,[13] they

would have taken "the same action absent [LaVallee's] protected speech because of his poor

performance as an English teacher."  (Docket No. 51 at 5).

By now, the elements a public employee must prove in prevailing on any First

Amendment speech-retaliation claim are well-defined.  That is, "a plaintiff must prove that (1)

[he] 'spoke as a citizen on a matter of public concern,' (2) [his] employer lacked 'an adequate

justification for treating [him] differently from any other member of the general public,' and (3)

[his] 'protected expression was a substantial or motivating factor in the adverse employment

decision.'"  <u>Salmon v. Lang</u>, 57 F.4th 296, 308 (1st Cir. 2022) (quoting <u>Bruce v. Worcester Reg'l</u>

---

denial of rights secured by the Constitution or by federal law."  (<u>Id.</u> (quoting <u>Meagher v. Andover Sch.</u>
<u>Comm.</u>, 94 F. Supp. 3d 21, 35 (D. Mass. 2015))) (additional citation omitted).

[13] <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).

Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022)) (additional citations omitted).[14]  Here, for the

purposes of summary judgment, the Defendants have conceded the existence of the test's first

two prongs, and so the dispute turns on whether LaVallee has satisfied its third.  (See Docket

No. 51 at 6).

The question the third prong presents, i.e., "[w]hether a plaintiff's protected speech was

a 'substantial or motivating factor in (an) adverse employment decision . . . is simply a question

of causation,' and is 'analyzed in two steps'" under what is known as "the Mt. Healthy burden-

shifting test."  Salmon, 57 F.4th at 308-09 (quoting Davignon v. Hodgson, 524 F.3d 91, 106 (1st

Cir. 2008)) (additional quotations and punctuation omitted).  The first step of this test requires

that the plaintiff "'show that the employer would not have taken adverse action but for the

plaintiff's speech,' through direct or circumstantial evidence of such a causal link."  Id. at 309.  If

the plaintiff meets this burden, the burden shifts to the defendant who must then prove, "'by a

preponderance of the evidence that it would have reached the same decision regarding the

adverse employment event even in the absence of the protected conduct.'"  Id. (quoting Stuart

v. City of Framingham, 989 F.3d 29, 35 (1st Cir. 2021)) (internal alterations, quotations and

citation omitted).  As discussed herein, LaVallee cannot meet his initial burden.

Deciding "whether speech was a motivating or substantial factor in the adverse

---

[14] LaVallee argues that "[i]t is clearly established that the First Amendment does not require an adverse employment act, but merely an act that would chill an ordinary person."  (Docket No. 55 at 4 (citing Barton v. Clancy, 632 F.3d 9, 29-30 (1st Cir. 2011))).  However, as the Barton case recognizes, and as discussed further infra, in the absence of a traditional negative impact on employment terms or conditions, "the 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively" "would have a chilling effect on the employee's exercise of First Amendment rights."  Barton, 632 F.3d at 29 (citation omitted).  Thus, there must be some discernable consequence arising out of the challenged conduct by the employer to maintain a claim under § 1983.

employment action" is a task which "ordinarily belongs to the jury."  Salmon v. Lang, Civil

Action No. 19-11378-RGS, 2021 WL 294512, at *4 (D. Mass. Jan. 28, 2021), aff'd, 57 F.4th 296

(1st Cir. 2022) (additional quotations and citation omitted).  "However, the court may enter

summary judgment if '(1) the record evidence compels the conclusion that the plaintiff would

have suffered the adverse employment action in any event for nondiscriminatory reasons, or

(2) the plaintiff did not introduce sufficient evidence in the first instance to shift the burden of

persuasion to the defendants.'"  Id. (quoting Guilloty Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir.

2003)) (internal punctuation omitted).  This is such a case.

        The Defendants point to LaVallee's evaluations, described above, to support their

contention that his teaching contract was not renewed due to his failure "to meet established

standards for acceptable performance as a teacher."  (Docket No. 51 at 7).  Such evaluations

established that, in the Defendants' view, LaVallee was unable to "improve in developing and

implementing lesson plans in a structured way" or "cover material required by the curriculum in

the time allotted[,]" throughout his two years of teaching.  (Id.).  As a result, the Defendants

maintain that, irrespective of his alleged protected speech, the nonrenewal of LaVallee's

teaching contract was nevertheless inevitable.  (Id.).

        LaVallee's arguments to the contrary are not persuasive.  In an attempt to discredit the

Defendants' overall evaluation of his performance, LaVallee challenges the accuracy of the

negative comments he received and cites only to the positive aspects of his evaluations.  (See

Docket No. 67 at 2, 4-5).  However, these arguments ignore the fact that the Defendants

consistently identified areas of his teaching which, in their view (whether warranted or not),

needed improvement.  Although LaVallee's primary argument is that these evaluations are

after-the-fact justifications for the decision to terminate his employment (see id. at 5), the undisputed facts establish that the same criticisms he received throughout the 2018-2019 school year pre-dated the confrontation about his failure to participate in the Pledge of Allegiance.  LaVallee has not put forth any facts to challenge the observations about the activities in his classes as described by those who evaluated his performance.  Similarly, he has not disputed the fact that he failed to take advantage of any help he was offered, or that he missed English department meetings as well as various check-in meetings with Hagan.  (See Lewis Aff., Ex. D at 55, 63; Newbill Aff. 1, Ex. 1 at 115-17, Ex. 2 at 59).

"The non-moving party cannot oppose a properly supported summary judgment motion by 'rest[ing] on mere allegations or denials of [the] pleadings'" but must instead "go beyond" them and "designate specific facts showing that there is a genuine issue for trial." Flynn v. Forrest, 605 F. Supp. 3d 319, 326 (D. Mass. 2022) (additional quotations and citations omitted) (alterations in original).  The record evidence, even when viewed in the light most favorable to LaVallee, compels the conclusion that when it came time to decide whether LaVallee's teaching contract would be renewed for a third year, at the end of which he would receive the benefits and protections of professional teacher status, the Defendants' decision against renewal was based solely on their evaluation of his teaching performance.  (See Lewis Aff., Ex. E at 14, Ex. F at 4-5, Ex. G at 15; Newbill Aff. 2, Ex. 13 at 53, 66-68).  LaVallee has thus failed to establish that his refusal to participate in the Pledge of Allegiance was a "substantial or motivating factor" either in his negative reviews or the termination of his employment.

LaVallee's other arguments are also unavailing.  For example, LaVallee argues that the Defendants opened up his position to outside candidates before his employment was

terminated, and he contends that this is evidence that the Pledge of Allegiance incident was the motivating factor in the termination decision.  (Docket No. 67 at 2).  However, this argument is not supported by the record and does not address the fact that the negative comments about his teaching style remained consistent through his employment and began before the issue of standing for the Pledge ever arose.  LaVallee also argues that D'Amato "testified under oath that she had no reason to not renew [his] contract."  (Docket No. 67 at 5).  However, the context of this cited deposition testimony establishes that D'Amato's response related to LaVallee's work as a special-education teacher and not his English teaching, which was the cause of concern.  (See Newbill Aff. 2, Ex. 20 at 19).  Similarly, LaVallee attempts to make an issue out of the fact that Forrest allegedly told him that his nonrenewal "ha[d] nothing to do with the budget or budget cuts."  (Docket No. 67 at 2).  Irrespective of whether this was ever said, LaVallee admits—over the next two lines of the same deposition testimony—that Forrest also told him "we're not renewing you because you didn't do all the things that we asked you to follow through on."  (Newbill Aff. 1, Ex. 1 at 140-41).  It is undisputed that the Pledge of Allegiance incident was not the express subject of any disciplinary proceeding and that no steps were taken to ensure that LaVallee stood for the Pledge – in fact, he continued not to do so.

LaVallee has not met his burden of establishing that his "protected speech was a 'substantial or motivating factor'" in the decision not to renew his teaching contract, and he has not pointed to any evidence demonstrating that, but for his speech, the Defendants would have otherwise renewed his teaching contract.  Having failed to "adduce[] evidence from which a reasonable juror could infer such a [causal] link," LaVallee has failed to carry his burden under Mt. Healthy, and any First Amendment retaliation claim predicated on the nonrenewal of his

[28]

teaching contract fails.[15]  <u>Salmon</u>, 57 F.4th at 312.

<u>LaVallee's Motion for Summary Judgment as to Count I</u>

Through his own cross-motion (Docket No. 54), LaVallee moves for partial summary judgment "as to liability for directing [him] to stand for the Pledge under Counts One and Two as to all defendants[.]"  (<u>Id.</u> at 1).  While the scope of this argument is not clear, it appears that LaVallee is arguing that Forrest's "direction" that he stand for the Pledge of Allegiance was "a clear violation of the First Amendment" (Docket No. 55 at 4), and that he suffered an adverse job action sufficient to support his § 1983 claim by being subjected to a directive which "viewed objectively … would have a chilling effect on the employee's exercise of First Amendment rights."  <u>Salmon</u>, 57 F.4th at 313-14 (quoting <u>Barton</u>, 632 F.3d at 29).  It is well-established that "[f]or purposes of speech retaliation an 'adverse employment decision' includes an action the employer takes that would 'deter a reasonably hardy individual from exercising his constitutional rights.'"  <u>Id.</u> at 308 (quoting <u>Gutwill v. City of Framingham</u>, 995 F.3d 6, 12 (1st Cir. 2021)) (internal punctuation omitted).  While, at his deposition, LaVallee testified that Forrest only expressed his "expectation" that LaVallee would stand for the Pledge, even assuming, <u>arguendo</u>, that LaVallee was ordered ("directed") to stand, he has still failed to state a claim.

1.  <u>Forrest's Request Did Not Chill LaVallee's First Amendment Rights</u>

The undisputed facts establish that no reasonable factfinder could find that Forrest's

---

[15] In light of this conclusion, the court will not reach the issue of whether the Defendants have carried their own burden under <u>Mt. Healthy</u> of showing a non-retaliatory reason for not renewing LaVallee's contract.  <u>See</u> <u>Salmon</u>, 57 F.4th at 313 n.10 (where plaintiff failed to make a prima facie showing, court's "analysis must stop here" – court will not address whether defendants had met their burden in response to plaintiff's claim of retaliation).

request or his ensuing actions would have deterred a reasonably hardy person from the exercise of his or her First Amendment rights or might have chilled those rights.  As detailed more fully above, after the meeting with the complaining parents, Forrest, LaVallee, Hagan, D'Amato, and Dwyer, LaVallee's union representative, met in order to address the content and the direction of LaVallee's teaching.  When, at their meeting, LaVallee asked, through Dwyer, to "revisit" Forrest's request that he stand for the Pledge, Forrest relayed his expectation, as he had previously, that LaVallee stand respectfully for the Pledge but did not indicate any expectation that LaVallee recite its words.  (See Newbill Aff. 1, Ex. 1 at 84-85).  Following their meeting, Forrest issued a memorandum to LaVallee and the meeting's other attendees wherein he summarized the meeting with the parents as follows:

> The parents contended that Thad was pushing his own political agenda within the English class.  The father had "interviewed" several of the students in this class, he had multiple examples of comments that Thad had made in class that the father felt were not appropriate.  Thad's contention was that the comments were taken out of context and that he was trying to have the students think in a different way. The end result of the meeting was that Thad was told that he could not promote his own political views within the classroom, that all discussions should relate back to the curriculum and that he should be the facilitator of such discussions.

(Lewis Aff., Ex. D at 45).  Forrest concluded his memorandum by listing a series of four "takeaways" from the meeting, the first of which included that "[LaVallee] is to keep his political agenda out of the classroom[,]" but none of which included any expectation, direction, or request that LaVallee stand for the Pledge.[16]  (Id.).  It is undisputed that on no occasion following this meeting was LaVallee ever again asked to stand.  Similarly, it is undisputed that LaVallee was never asked to recite the Pledge.

---

[16] These four "takeaways" were: (1) "Thad is to keep his political agenda out of the classroom"; (2) "All discussions should revolve around the grade 10 English curriculum"; (3) Thad is to seek approval from

Following his meeting with Forrest, LaVallee claims that on only one occasion did Forrest ever take any steps in furtherance of his request that LaVallee stand for that Pledge.  He describes this occasion as an "observation[]" in which Forrest "walked by [his] classroom one morning" as he sat and took attendance during the Pledge.  (Lewis Aff., Ex. D at 22-23).  While he claims that Forrest was able to see inside his classroom as he walked by, LaVallee acknowledges that Forrest did not "directly stop[]" outside or "directly look[] in[.]"  (Id.).  And even after allegedly having seen him sitting, LaVallee does not claim that Forrest took further action then, or at any later time, to compel LaVallee to stand, and LaVallee's decision was never the subject of any further discussion.  See Salmon, 57 F.4th at 315-16 (no chilling effect where "isolated examples" of alleged retaliation, even when taken together, "had no discernable impact on [plaintiff's] work conditions that would deter a reasonably hardy person from continuing to exercise his constitutional rights.").

Forrest's actions in requesting LaVallee to stand cannot be likened to a "campaign of informal harassment" either.  Id. at 314 (additional quotations and citations omitted).  While even "relatively minor events" may form the groundwork for liability in this context, they must not be "so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights."  Id.  Only where these occurrences are "sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations" may § 1983 liability arise.  Delaney v. Town of Abington, 211 F. Supp. 3d 397, 404 (D. Mass. 2016), aff'd, 890

---

Brenda for any materials outside of the curriculum"; and (4) "Thad will meet with Brenda one time per cycle (Day 7, Period 3) to develop and review lesson plans for the coming week."  (Lewis Aff., Ex. D at 45).  LaVallee does not, and cannot, allege that these requirements, which simply reinforced Dedham Public School policies and were in no way burdensome, rose to the level of retaliation.

F.3d 1 (1st Cir. 2018) (additional citation omitted).  "The common thread throughout the relevant case law is the existence of numerous, ongoing, interconnected incidents that result in a campaign or pattern of harassment."  <u>Alston v. Town of Brookline, Massachusetts</u>, Civil Action No. 15-13987-GAO, 2017 WL 1536213, at *5, *8 (D. Mass. Feb. 1, 2017) (and cases cited) (allowing motion to dismiss First Amendment retaliation claims brought under § 1983 where complained-of incidents "did not result in any actionable harm" and even "when taken together," could "not constitute a campaign or pattern of harassment") (additional quotations and citation omitted).  The undisputed facts preclude a finding of any such campaign or pattern of harassment in the instant case.

Similarly, and perhaps more importantly, in light of the fact that LaVallee chose to continue to sit during the Pledge of Allegiance, it's clear that his exercise of his First Amendment rights was not, in fact, chilled.  Where, as here, LaVallee continued his actions without interference or harassment, the record does not support his contention that his exercise of his First Amendment rights was impeded.  <u>See</u> <u>Willoughby v. Tisbury</u>, 750 F. Supp. 2d 374, 381 (D. Mass. 2010) (dismissing First Amendment § 1983 claim where plaintiffs continued to complain despite actions of police; complaint did not plead facts "sufficient to show that Defendants' actions in fact chilled or intimidated their speech"); <u>see</u> <u>also</u> <u>Hurwitz v. Newton Public Schools</u>, Civil Action No. 17-10231-LTS, 2017 WL 3008886, at *3 (D. Mass. July 14, 2017) (plaintiffs did not plead First Amendment claim where they failed to show that speech was in fact chilled; plaintiffs had, in fact, "alleged facts to the contrary" in that they "persisted in speaking out").  The inquiry as to whether LaVallee suffered an "adverse employment action" sufficient to state a § 1983 claim "'focuses on whether an employer's acts, viewed objectively …

would have a chilling effect on the employee's exercise of First Amendment rights' that is

tantamount to 'substantial pressure.'"  Salmon, 57 F.4th at 313-14 (quoting Barton, 632 F.3d at

29).  Viewing the undisputed facts objectively compels the conclusion that LaVallee has failed to

establish a violation of his First Amendment rights.  See Delaney, 211 F. Supp. 3d at 407

(defendants entitled to summary judgment on plaintiff's First Amendment claims "given the

paucity of affirmative evidence of a speech-chilling adverse employment action in response to

[plaintiff's] First Amendment activities").

     2.  There Is No Evidence That LaVallee Was Compelled to Stand

     Finally, LaVallee appears to move for summary judgment on Count I as to liability only

on the grounds that Forrest violated his First Amendment rights by ordering him to stand for

the Pledge of Allegiance, and he seems to argue that the court's inquiry should end with that

fact.  (See Docket No. 55 at 4-7).  While LaVallee agrees that it is constitutional to "request" a

teacher to stand for the Pledge of Allegiance, he contends that, in this case, Forrest committed

a constitutional violation because he "ordered" him to stand.  (Docket No. 67 at 12-13).  This

argument fails as a matter of law and fact.

     As an initial matter, LaVallee has not developed this argument in any way, and he has

not explained how it differs from his contention that his exercise of his First Amendment rights

was chilled as a result of the request that he stand, an argument that was discussed fully above.

(See also note 13, supra).  "When an issue is merely mentioned in an undeveloped fashion and

in a perfunctory manner, the court may deem the issue waived."  Malave-Torres v. Cusido, 919

F. Supp. 2d 198, 213 (D.P.R. 2013) (additional citations omitted); see also Coons v. Indus. Knife

Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("[J]udges are not obligated to do a party's work for

him, searching *sua sponte* for issues that may be lurking in the penumbra of the motion

papers.") (additional quotations and citation omitted).[17]

Furthermore, there is simply no evidence in the record that would suffice to create a

genuine dispute, and therefore a triable issue, over whether LaVallee was indeed given an

enforceable order to stand.  According to LaVallee's own deposition testimony, Forrest only

ever expressed his "expectation" that LaVallee would stand.  (Lewis Aff., Ex. D at 12-13).  And in

that same testimony, LaVallee admits that Forrest never indicated that his employment

depended on him standing.  (Id.).  The undisputed facts establish that the issue was never

discussed further after their meeting on September 25, 2018, and that while Forrest was aware

that LaVallee continued not to stand, he took no steps to convince, require, or otherwise

compel LaVallee to stand.  The undisputed facts further establish that after this meeting at the

beginning of the 2018-2019 school year, LaVallee's teaching was reviewed in connection with

four unannounced observations and two announced observations which resulted in some

negative evaluations.  None of these evaluations referenced, in any fashion, LaVallee's decision

not to stand during the Pledge of Allegiance, and job performance was the sole reason given for

the nonrenewal of LaVallee's teaching contract.  At most, LaVallee may have been asked to do

something which conflicted with his own personal or political beliefs, and he declined to do so.

---

[17] For the same reason, LaVallee's new argument, raised for the first time at oral argument that Forrest's request amounts to an impermissible "prior restraint" and a violation of his First Amendment rights is deemed waived, along with any other argument he has failed to raise and/or develop.  See Peter Pan Bus Lines, Inc. v. Greyhound Lines, Inc., 189 F. Supp. 3d 217, 225 (D. Mass. 2016) (waiving argument "neither raised in [plaintiff's] briefing nor sufficiently developed at the hearing"); U.S. ex rel. Dyer v. Raytheon Co., Civil Action No. 08-10341-DPW, 2013 WL 5348571, at *25 (D. Mass. Sept. 23, 2013) ("except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.") (additional quotations and citation omitted).

But the fact remains that there is no evidence that he was at any time forced or coerced by Forrest into changing his behavior.  LaVallee has not established that Forrest's "actions were sufficiently oppressive to chill the speech of a reasonably hardy individual."  Barton, 632 F.3d at 30.  "To hold that a violation of constitutional rights occurred, under the circumstances stated, would be to trivialize the First Amendment" especially where, as here, LaVallee "was anything but intimidated."  Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989) (additional citation omitted).

Accordingly, the Defendants' Motion for Summary Judgment as to Count I is allowed and LaVallee's Motion for Partial Summary Judgment as to Count I is denied.[18]

### D.  Count II:  Federal Free Exercise / Establishment Clause Claim Against All Defendants

Both sides have also moved for summary judgment with respect to Count II, which states in relevant part, "[t]he Defendants' actions complained of herein violate LaVallee's Free Exercise rights and the Establishment Clause under the First and Fourteenth Amendments of the U.S. Constitution.  This claim is brought pursuant to 42 U.S.C. § 1983." (Compl. ¶ 83).  Both sides focus their arguments on whether the request that LaVallee stand for the Pledge "substantially burdened the exercise of his religion[.]"  (Docket No. 51 at 13; see Docket No. 55 at 1; Docket No. 61 at 12).[19]  For the reasons that follow, the Defendants are entitled to

---

[18] Having found no constitutional violation, this court need not reach the issue of qualified immunity raised by the Individual Defendants as a defense to Count I.  See Slattery v. Town of Framingham, Civil Action No. 17-cv-11187-IT, 2020 WL 6566553, at *7 (D. Mass. Nov. 9, 2020) (addressing defendants' qualified immunity defenses was unnecessary where plaintiff failed to satisfy all three prongs of First Amendment retaliation claim's three-part inquiry); see also McGunigle v. City of Quincy, 835 F.3d 192, 206 n.11 (1st Cir. 2016).  Furthermore, in reaching this conclusion, the court does not—and need not—express any opinion with respect to Mass. Gen. Laws ch. 71, § 69.

[19] LaVallee does not include any Establishment Clause arguments in any of his briefs and any such argument will, therefore, be deemed waived.  See Coons, 620 F.3d at 44.

summary judgment on Count II, and LaVallee's cross-motion shall be denied.

The First Amendment to the United States Constitution reads, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The Free Exercise Clause of the First Amendment thus "prohibits the government from '(1) compel[ling] affirmation of religious beliefs; (2) punish[ing] the expression of religious doctrines it believes to be false; (3) impos[ing] special disabilities on the basis of religious views or religious status; or (4) lend[ing] its power to one side or the other in controversies over religious authorities or dogma.'" Perrier-Bilbo v. United States, 954 F.3d 413, 428-29 (1st Cir. 2020) (quoting Freedom From Religion Found. v. Hanover Sch. Dist., 626 F.3d 1, 14 (1st Cir. 2010)) (additional citation omitted) (alterations in original). "A plaintiff alleging a Free Exercise violation must show that a government action has a coercive effect on [his] religious practice." Id. (citing Parker v. Hurley, 514 F.3d 87, 103 (1st Cir. 2008)) (additional citation omitted). LaVallee cannot meet this burden.

As an initial matter, LaVallee's rather cursory argument relies on his contention that Forrest ordered or attempted to coerce him into standing. (See Docket No. 61 at 13). For the reasons discussed above, the record does not support this characterization of Forrest's actions. Moreover, it is undisputed that Forrest's request was never enforced, and LaVallee admits that he continued to follow, without interference, his practice of not standing. LaVallee's claim must fail because he has not demonstrated that the Defendants "coerced [him] into violating or changing [his] religious beliefs or practices." Perrier-Bilbo, 954 F.3d at 429. See Parker, 514 F.3d at 99 (recognizing "the standard constitutional threshold question" to be "whether the plaintiff's free exercise is interfered with at all"). Where, as here, LaVallee has "failed to

provide specific evidence or discuss concrete events that would allow a jury to ground its conclusion in objective facts rather than Plaintiff's subjective interpretation of events" his motion for summary judgment must be denied, and the Defendants' motion must be allowed. Williams v. Kennedy, 38 F. Supp. 3d 186, 199 (D. Mass. 2014).[20]

### E. Count III: Federal Substantive Due Process Clause Claim Against Principal Forrest

Count III sets forth a third § 1983 claim, but against Forrest alone, for his abridgement of LaVallee's "right to substantive due process, liberty, bodily integrity, and to be free from threats to bodily integrity, under the Fifth and Fourteenth Amendments of the U.S. Constitution." (Compl. ¶ 85).  The Due Process Clause of the Fourteenth Amendment to the United States Constitution forbids a state from depriving any person of "life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  With "both procedural and substantive components[,]" Harron v. Town of Franklin, 660 F.3d 531, 535 (1st Cir. 2011) (citation omitted), substantive due process "'functions to protect individuals from particularly offensive actions on the part of government officials.'"  Gonzalez-Droz, 660 F.3d at 16 (quoting Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006)).  It is well-settled that, in order to make out a violation of substantive due process, a plaintiff "bears the burden of showing that the challenged actions were 'so egregious as to shock the conscience.'"  Id.  Such conduct has been described as that

---

[20] Finding Forrest's actions constitutional, LaVallee's arguments that, under Counts I and II, Welch is subject to supervisory liability, and the Town of Dedham and Dedham Public Schools are subject to municipal liability, must also fail.  See Ramirez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir. 2014) (for supervisory liability to arise, "the subordinate's behavior must have caused a constitutional violation"); see also Gilbert v. City of Chicopee, 915 F.3d 74, 84 (1st Cir. 2019) (no municipal liability where no predicate constitutional injury: "[t]o make out a municipal liability claim, [plaintiff] would have to first prove a viable First Amendment retaliation claim").

which is "truly outrageous, uncivilized, and intolerable."  Id. (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999)).

In opposing the Defendants' Motion for Summary Judgment, LaVallee presents his substantive due process claim as one based on Forrest having "allow[ed] a parent to berate a teacher[,]" where "[t]he parent's behavior certainly shocks the conscience, and Forrest's incapacity to stop what he created, intentionally or not, should too."  (Docket No. 67 at 13-14) (cleaned up).  "In general, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'"  Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 297 (D. Mass. 2017) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197, 109 S. Ct. 998, 1004, 103 L. Ed. 2d 249 (1989)).  The Clause is, after all, "'phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.'"  Id. (quoting DeShaney, 489 U.S. at 195, 109 S. Ct. at 1003).  Here, Forrest's alleged failure to stop irate parents from inappropriately haranguing LaVallee does not constitute such egregious behavior as to support a due process violation.

At oral argument, LaVallee characterized his claim as seeking to hold Forrest liable for a "state-created danger."  However, the record does not support such a claim either.  It is well-established that "when the state creates the danger to an individual, an affirmative duty to protect might arise."  Irish v. Fowler, 979 F.3d 65, 73 (1st Cir. 2020).  Nevertheless, to make out a state-created danger claim in the First Circuit, a plaintiff must establish:

(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;

(2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct

from the danger to the general public;

(3) that the act or acts caused the plaintiff's harm; and

(4) that the state actor's conduct, when viewed in total, shocks the conscience.

> (i) Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.

> (ii) Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

Irish, 979 F.3d at 75.

Insofar as LaVallee alleges any substantive due process claim against Forrest based on his deliberate indifference to stop the parent meeting or protect him from the actions of the complaining parent, he has nevertheless failed to "demonstrate" through any evidence—or even allege—"that the defendant actually knew of a substantial risk of serious harm and disregarded that risk." Id. In fact, in his Opposition to the Defendants' Motion, LaVallee admits that the opposite is true, acknowledging that, "[o]f course, Principal Forrest could not have known how vile the parent would have been with Plaintiff." (Docket No. 67 at 13). In addition, Forrest's conduct at the meeting (which, according to LaVallee, started off very supportive of him) simply does not rise to the level of a due process violation. The Defendants are entitled to summary judgment on Count III as well.

**F. Counts IV - VI:  Massachusetts Civil Rights Act Claims**

The Defendants have also moved for summary judgment on Counts IV through VI, which

allege a violation of LaVallee's state constitutional rights.[21]  (See Compl. ¶¶ 87, 89, 91).

LaVallee brings each of these claims pursuant to the Massachusetts Civil Rights Act ("MCRA"),

Mass. Gen. Laws ch. 12, §§ 11H and 11I, "a state-law analogue to 42 U.S.C. § 1983" which

provides redress for interference "with the exercise or enjoyment of rights secured by federal

or state law." Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011).  While, in some respects, "the

MCRA is broader than § 1983 in that it reaches private conduct[,]" it is also "narrower than §

1983 in that it limits its remedy to conduct that interferes with a secured right 'by threats,

intimidation or coercion.'" Id. (quoting Mass. Gen. Laws ch. 12, § 11H).

     In his Complaint, LaVallee describes his three MCRA claims as based on the same

allegations which support his federal § 1983 claims in Counts I through III.  (See Compl. ¶¶ 87,

89, 91).  "Given the court's determination that defendants are entitled to summary judgment

on the federal § 1983 . . . claims, it follows that there is no violation of state or federal law on

which to ground an MCRA claim." Delaney, 211 F. Supp. 3d at 408 (citing McGunigle, 835 F.3d

at 205-06).  Moreover, LaVallee "has failed to identify threats, intimidation, or coercion" by the

Defendants "sufficient to give rise to an MCRA claim." McGunigle, 835 F.3d at 205.

Furthermore, the fact that LaVallee "subjectively may have felt 'threatened' or 'intimidated'" by

the Defendants is insufficient to support any MCRA claim, especially where, as discussed above,

the Defendants' conduct, viewed objectively, failed to rise to the level of a constitutional

violation, and LaVallee himself has admitted that he was not prohibited from and continued to

exercise his First Amendment right not to stand.  See Salmon, 57 F.4th at 318 (quoting Glovsky

---

[21] Counts IV and V are brought against the Individual Defendants, while Count VI is brought against
Forrest alone.  (See Compl. ¶¶ 87, 89, 91).

v. Roche Bros. Supermarkets, Inc., 469 Mass. 752, 764, 17 N.E.3d 1026, 1037 (2014)).  The

Defendants are therefore entitled to summary judgment on Counts IV through VI.

### G. Count VII:  Tortious Interference with Advantageous/ Contractual Relationships Against Individual Defendants

In Count VII, LaVallee asserts an interference claim against Welch and Forrest, the

Individual Defendants, for their "intentional[] interfere[nce] with [his] advantageous/contractual

relationship with the District" with "malice and through improper motives and/or through the

use of improper means[.]" (Compl. ¶ 95).  To succeed on a claim of tortious interference with a

contractual relationship, a plaintiff must prove that:

> (1) he had a contract with a third party; (2) the defendant knowingly interfered
> with that contract …; (3) the defendant's interference, in addition to being
> intentional, was improper in motive or means; and (4) the plaintiff was harmed by
> the defendant's actions.

Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (quoting O'Donnell v. Boggs, 611 F.3d 50,

54 (1st Cir. 2010)) (additional citation omitted).[22]  Where, as here, "a plaintiff sues a municipal

official or municipality, a plaintiff must show that 'actual malice, that is, a spiteful, malignant

purpose, unrelated to the legitimate municipal interest' was the controlling factor in the

interference."  Cummings v. City of Newton, 298 F. Supp. 3d 279, 290 (D. Mass. 2018) (quoting

Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 661-62, 893 N.E.2d 407, 411 (2008))

(additional citation omitted).  The burden of proving actual malice rests on the plaintiff.  Id.

In his Opposition, LaVallee claims that his refusal to abide by Forrest's request resulted

in the imposition of "onerous tasks" and, eventually, in his termination.  (Docket No. 67 at 14).

---

[22] "[U]nder Massachusetts law, the tort of interference with an advantageous business relationship
apparently includes within its ambit the tort of wrongful interference with an existing contract[.]"
Hamann v. Carpenter, 937 F.3d at 92-93.

In support of this assertion, LaVallee cites to his own deposition testimony, in which he claims an email from Hagan asking him to complete a template for lesson planning amounted to "extra homework to do on top of everything else."  (Newbill Aff. 1, Ex. 1 at 102-03).  This email included a request that he "[r]emember to include how [he] will hold students accountable for their learning" which was consistent with Hagan's earlier criticism of LaVallee's teaching, as detailed above.  (Id. at 102).

While LaVallee may not agree with the criticism about his job performance, he has failed to establish that the Defendants' actions were "unrelated to the legitimate municipal interest" and that the Defendants acted with actual malice.  Rather, the summary judgment record in this case "is replete with examples (some supplied by the plaintiff [himself]) of the troubles that the plaintiff was having on the job."  Shea v. Emmanuel College, 425 Mass. 761, 764, 682 N.E.2d 1348, 1351 (1997).  "[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported summary judgment motion."  Cruz v. Mattis, 861 F.3d 22, 26 (1st Cir. 2017) (alteration in original) (citations omitted).  LaVallee has failed to submit any evidence of actual malice which might support his claim of interference and, accordingly, the Defendants' Motion for Summary Judgment with respect to Count VII is allowed.

### H.  Count VIII:  Wrongful Termination Against All Defendants

The Complaint's eighth and final count is a claim of wrongful termination against all Defendants, "in violation of public policy, including Free Speech, Free Exercise, and Establishment Clause."  (Compl. ¶ 97).  In his Opposition, LaVallee presents his wrongful termination claim as "premised on the public policy enunciated in the First Amendment, that

Americans are free to speak their mind, to stand, to not stand, to express their viewpoints as they see fit" and contends that his employment was terminated because the Defendants "disagreed with his viewpoint." (Docket No. 67 at 14). For all the reasons detailed above, however, LaVallee has failed to establish that the nonrenewal of his teaching contract stemmed from anything but the Defendants' dissatisfaction with his job performance. LaVallee has similarly failed to establish that his decision not to stand was the cause of any adverse job action. Summary judgment shall enter in favor of the Defendants on Count VIII. See Elliott-Lewis v. Abbott Labs., Inc., 411 F. Supp. 3d 195, 210 (D. Mass. 2019) (wrongful termination claim based on public policy violation failed where plaintiff "failed to show a causal connection between her allegations of wrongdoing and her termination" and there was otherwise "strong evidence of a legitimate basis for termination").

## IV. **CONCLUSION**

For all the reasons detailed herein, the "Defendants' Motion for Summary Judgment" (Docket No. 50) is ALLOWED, and the "Plaintiff's Partial Motion for Summary Judgment" (Docket No. 54) is DENIED. The "Defendants' [] Motion to Strike Plaintiff's Affidavit and Statement of Undisputed Material Facts" (Docket No. 59) is ALLOWED IN PART and DENIED IN PART as provided herein.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[43]